1
2
3
4
5                        UNITED STATES DISTRICT COURT

6                        EASTERN DISTRICT OF CALIFORNIA

7   RAY ANTHONY JONES,                    )   1:06-CV-00725 OWW JMD HC
                                          )
8              Petitioner,                )
                                          )
9       v.                                )   FINDINGS AND RECOMMENDATION
                                          )   REGARDING PETITION FOR WRIT OF
10  MENDOZA-POWERS,                       )   HABEAS CORPUS
                                          )
11             Respondent.                )
                                          )
12  _____

13         Petitioner Ray Anthony Jones ("Petitioner") is a state prisoner proceeding pro se with a

14  petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

15                              **BACKGROUND**

16         Petitioner is currently in the custody of California Department of Corrections and

17  Rehabilitation pursuant to a judgment of the Merced County Superior Court.  (Pet. at 2; Answer at

18  1.)  Petitioner was convicted of first degree murder and sentenced to an indeterminate life sentence.

19  (Answer at 1).

20         On March 24, 2004, Petitioner appeared before the California Board of Prison Terms[1] (the

21  "Board") for a parole consideration hearing.  (Answer at 1).  The Board found Petitioner unsuitable

22  for parole.  (Id.)

23         Petitioner then sought habeas corpus relief before the Merced County Superior Court.

24  (Answer at 2).  The Superior Court denied Petitioner's request for relief on June 2, 2005.  (Answer

25  Ex. D at 2-3).

26  _____

27      [1]The Board of Prison Terms was replaced, effective July 1, 2005, by the Board of Parole Hearings ("BPH").  *See*
    In re Olson, 149 Cal.App.2th 790, 793 n. 1 (Cal. Ct. App. 2007).  The Board of Parole Hearings has the same duties and
28  functions with respect to adult term setting and parole release decisions as its predecessor.  Id. (citing Cal. Penal Code, §§
    5075, 5075.1, 3041, Cal. Gov. Code, §§ 12838, 12838.4, added or amended by (Stats.2005, ch. 10 (Sen. Bill No. 737), §§
    6, 29, 46, 47, pp. 1-21, eff. May 10, 2005, operative July 1, 2005)).

1    On July 11, 2005, Petitioner sought habeas corpus relief before the California Court of

2  Appeal.  (Answer Ex. E at 2).  Petitioner's request was summarily denied by the state appellate court

3  on July 21, 2005.  (Id.)

4    On December 16, 2005, Petitioner filed a petition for writ of habeas corpus with the

5  California Supreme Court challenging the Board's decision.  (Answer at 2).  The California Supreme

6  Court summarily denied the petitioner on September 13, 2006.  (Pet. Ex. L).

7    On October 23, 2006, Petitioner filed the instant federal petition for writ of habeas corpus

8  with the Northern District of California.  (Pet. at 1).  On October 26, 2006, the petition was

9  transferred to this Court, pursuant to  28 U.S.C. § 2241(d).

10    The petition raises eleven grounds for relief: 1) the Board violated Petitioner's right to due

11  process of the law as the Board's denial of parole was not reached by a preponderance of relevant

12  and material evidence; 2) the Board violated Petitioner's right to due process by failing to consider

13  factors set forth in California regulations; 3) the Board's decision violated the *ex post facto*

14  prohibition, the pre-Briggs Initiative standard, and constitutes excessive punishment; 4) the Board's

15  decision was based on legally vague language regarding the gravity of the offense in violation of

16  Petitioner's constitutional rights; 5) the District Attorney's opposition to parole is an insufficient

17  basis to deny parole; 6) there exists no evidence to justify the Board's finding that Petitioner required

18  additional therapy; 7) the Board failed to consider the amount of time Petitioner had already served;

19  8) Petitioner's liberty interest is violated by the state's "no parole policy" for murder convictions; 9)

20  the Board's failure to set a primary term violates Petitioner's right to due process of the law; 10) the

21  Board's reliance on Dr. Sheldon's report is a violation of Petitioner's due process rights; 11)

22  Board's reliance on static factors to deny parole violates Petitioner's liberty interest.  (Pet. at 5-6, 8-

23  11).

24    On July 12, 2007, Respondent filed an answer to the petition.

25    On July 24, 2007, Petitioner filed a traverse to Respondent's answer.

26                              **FACTUAL BACKGROUND**

27    As California regulations permit consideration of the circumstances of the underlying offense

28  in the Board's consideration of whether a prisoner is suitable for parole, the facts of the underlying

1    offense are relevant to a determination of whether there was "some evidence" to support the Board's

2    finding that Petitioner posed a danger to the public safety.  *See* Cal. Code Regs., § 2402(c)(1).

3        The Board incorporated by reference the Statement of Facts derived from a Board report

4    issued on October 2003.  The referenced material, as read, stated:

> On approximately January 3rd, 1972, at approximately 3:34 p.m., officers were
> dispatched to Slater's Market in Merced, California, as it was reported that a man had
> been shot during a robbery at the establishment.  Officers reported to the scene where
> they observed the victim, Herbert Morgan, lying between two checkout counters.  The
> victim had blood stains at his lower right abdomen area with a bullet hole slightly
> right and to the left of his navel.  However, investigation of the area revealed a cash
> register had been opened and emptied.  According to Mr. King, a friend of the victim,
> he and the victim were in the store preparing to make popcorn at the checkout counter
> when the [Petitioner] entered the store and approached the counter. [Petitioner] then
> produced a weapon and demanded money.  The victim opened the cash drawer.  As
> [Petitioner] reached for the cash with the gun in his hand it discharged a single round,
> struck Morgan in the abdomen area.  He then fell to the floor. [Petitioner] fled the
> scene immediately after discharging the gun.  On January 4, 1979, Detective Hong
> was contracted by an informant who named [Petitioner] as the shooter and stated that
> [Petitioner] wished to talk to the detective and would meet with him. [Petitioner] did
> meet with the detective and was placed into custody.  During the interview,
> [Petitioner] stated that the gun had discharged by accident and that he did not intend
> to shoot the victim.  He had reached into the cash drawer with the gun in his hand.
> When the victim moved the cash drawer, the gun discharged hitting the victim.

15   (Answer Ex. B at 9-10)

16       Petitioner provided additional details of events at the Board hearing.  Petitioner stated

17   that when he reached his hand into the cash drawer, the gun went off but that the victim was

18   not nearby the cash drawer.  (Id. at 17).  Petitioner further elaborated that money to repay a

19   drug debt motivated his commission of the crime.  (Id. at 15).  However, the victim's store

20   was not a premeditated target but a target of opportunity.  (Id. at 16).  Petitioner also

21   acknowledged that he obtained approximately one hundred dollars from the robbery.  (Id.)

22                              **DISCUSSION**

23   **I.    Jurisdiction**

24       A person in custody pursuant to the judgment of a state court may petition a district court for

25   relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or

26   treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529

27   U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by

28   the U.S. Constitution.  Furthermore, the challenged conviction arises out of the Merced County

1  Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.

2  § 2241(d).  Accordingly, the Court has jurisdiction over the action.

3        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

4  1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

5  enactment.  Lindh v. Murphy, 521 U.S. 320, 326-327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

6  (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97

7  F.3d 751, 769 (5th Cir. 1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by

8  Lindh, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The

9  instant petition was filed on August 10, 2005 and is consequently governed by the provisions of the

10  AEDPA, which became effective April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).

11  **II.**     **Standard of Review**

12  **A.**     **AEDPA Standard of Review**

13        While Petitioner is not challenging the underlying state court conviction, Petitioner is in

14  custody of the California Department of Corrections and Rehabilitation pursuant to a state court

15  judgment.  Thus, 28 U.S.C. § 2254 remains the exclusive vehicle for Petitioner's habeas petition

16  since he satisfies the threshold requirement of being in custody pursuant to a state court judgment.

17  Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir. 2006) (quoting White

18  v. Lambert, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that, "[s]ection 2254 'is the exclusive

19  vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even

20  when the petitioner is not challenging his underlying state court conviction'").

21       Since Petitioner filed his petition after the effective date of AEDPA, his petition for habeas

22  corpus "may be granted only if he demonstrates that the state court decision denying relief was

23  "contrary to, or involved an unreasonable application of, clearly established Federal law, as

24  determined by the Supreme Court of the United States.'"  Irons v. Carey, 505 F.3d 846, 850 (9th Cir.

25  2007) (quoting 28 U.S.C. § 2254(d)(1)); see Lockyer, 538 U.S. at 70-71.

26       As a threshold matter, this Court must "first decide what constitutes 'clearly established

27  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

28  (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

1  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

2  the time of the relevant state-court decision." Id. (quoting Williams, 592 U.S. at 412). "In other

3  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

4  principles set forth by the Supreme Court at the time the state court renders its decision." Id.

5        Finally, this Court must consider whether the state court's decision was "contrary to, or

6  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

7  (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant

8  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

9  question of law or if the state court decides a case differently than [the] Court has on a set of

10 materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

11 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

12 identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

13 that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may

14 not issue the writ simply because the court concludes in its independent judgment that the relevant

15 state court decision applied clearly established federal law erroneously or incorrectly. Rather, that

16 application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable

17 application" inquiry should ask whether the state court's application of clearly established federal law

18 was "objectively unreasonable." Id. at 409.

19       Petitioner bears the burden of establishing that the state court's decision is contrary to or

20 involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

21 94 F.3d 1321, 1325 (9th Cir.1996). Although only Supreme Court law is binding on the states, Ninth

22 Circuit precedent remains relevant persuasive authority in determining whether a state court decision

23 is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003); Duhaime v.

24 Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

25       AEDPA requires that we give considerable deference to state court decisions. The state

26 court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

27 interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied,

28 537 U.S. 859, 123 S.Ct. 231 (2002), rehearing denied, 537 U.S. 1149, 123 S.Ct. 955 (2003).

1   **B.      Standard Governing Parole Release Determinations**

2          "We analyze a due process claim in two steps.  '[T]he first asks whether there exist a liberty

3   or property interest which has been interfered with by the State; the second examines whether the

4   procedures attendant upon that deprivation were constitutionally sufficient.'" Sass, 461 F.3d at 1127.

5   The United States Constitution does not, by itself, create a protected liberty interest in a parole date.

6   Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, where a state's statutory scheme for parole

7   contains mandatory language, the presumption exist "that parole release will be granted' when or

8   unless certain designated findings are made, and thereby give rise to a constitutional liberty

9   interest.'" McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (quoting Greenholtz v. Inmates

10  of Nebraska Penal, 442 U.S. 1, 12 (1979) in holding that California's parole scheme gives rise to a

11  cognizable liberty interest in release on parole).  California Penal Code section 3041 contains the

12  requisite mandatory language, thus vesting in California prisoners "whose sentence provide for the

13  possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release

14  date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."

15  Irons, 505 F.3d at 850; see McQuillion, 306 F.3d at 903; see also Biggs v. Terhune, 334 F.3d 910,

16  914 (9th Cir. 2003).  Even a prisoner who has not yet been granted a parole date has a

17  constitutionally protected liberty interest in a parole date.  Sass, 461 F.3d at 1123.

18          Notwithstanding a prisoner's liberty interest in a parole date,  a parole release determination

19  is not subject to all of the due process protections of an adversarial proceeding.  Pedro v. Oregon

20  Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12

21  (explaining that due process is flexible and calls for procedural protections as demanded by the

22  particular situations).  "[S]ince the setting of a minimum term is not part of a criminal prosecution,

23  the full panoply of rights due a Petitioner in such a proceeding is not constitutionally mandated, even

24  when a protected liberty interest exists."  Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole,

25  833 F.2d 1389, 1390 (9th Cir.1987).  At a state parole board proceeding, an inmate is entitled to

26  receive advance written notice of a hearing.  Pedro, 825 F.2d at 1399.  Additionally, the inmate must

27  be afforded an "opportunity to be heard" and told why "he falls short of qualifying for parole."

28  Greenholtz, 442 U.S. at 16.

1      "In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation of

2  good time does not comport with 'the minimum requirements of procedural due process' unless the

3  findings of the prison disciplinary board are supported by some evidence in the record.'"  Sass, 461

4  F.3d at 1128 (citations omitted).  The Ninth Circuit has held that the same standard of "some

5  evidence" that applies to the revocation of good time also extends to parole determinations.  Irons,

6  505 F.3d at 851.  The "some evidence" standard as applied to parole determinations is clearly

7  established Federal law, pursuant to the decisions of the Supreme Court.  Id.; Sass, 461 F.3d at

8  1128-1129.  This evidentiary standard prevents arbitrary deprivations of the prisoner's liberty interest

9  without imposing undue administrative burdens or threatening institutional interests.  Superintendent

10 v. Hill, 472 U.S. 445, 455 (1985).  In assessing "whether a state parole board's suitability

11 determination was supported by 'some evidence' in a habeas case, our analysis is framed by the

12 statutes and regulations governing parole suitability determinations in the relevant state."  Irons, 505

13 F.3d at 851.  In reviewing the record and determining whether the "some evidence" standard is met,

14 the Court need not examine the entire record, independently assess the credibility of witnesses, or

15 re-weigh the evidence.  Sass, 461 F.3d at 1128 (citing Hill, 472 U.S. at 455-456).  Rather, the

16 relevant inquiry is whether there is any evidence in the record that could support the Board's

17 decision.  Sass, 461 F.3d at 1128.

18      California law provides that after an eligible life prisoner has served the minimum term of

19 confinement required by statute, the Board "shall set a release date unless it determines that the

20 gravity of the current convicted offense or offenses, or the timing and gravity of current or past

21 convicted offense or offenses, is such that consideration of the public safety requires a more lengthy

22 period of incarceration for" the prisoner.  Cal. Penal Code § 3041(b).  "[I]f in the judgment of the

23 panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the

24 prisoner must be found unsuitable and denied parole.  Cal. Code Regs., § 2402(a); *see* In re

25 Dannenberg, 34 Cal.4th 1061, 1078, 1080 (Cal. 2005).  The Board decides whether a prisoner is too

26 dangerous to be suitable for parole by applying factors set forth in the California Code of

27 Regulations.  *See* 15 Cal. Code Regs., tit. 15 § 2402; Irons, 505 F.3d at 851-852; Biggs, 334 F.3d at

28 915-916.  The regulation's criteria states that:

All relevant, reliable information available to the panel shall be considered in determining suitability for parole.  Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstance which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs., tit. 15, § 2402(b)

Factors supporting a finding of unsuitability for parole include (1) the underlying offense was carried out in an "especially heinous, atrocious or cruel manner"; (2) a record, prior to incarceration for the underlying offense, of violence; (3) a history of unstable relationships with others; (4) sadistic sexual offenses; (5) a lengthy history of severe mental problems related to the underlying offense; (6) serious misconduct in jail.  Cal. Code Regs., tit. 15, § 2402 (c)(1)-(6); also In re Shaputis, 82 Cal.Rptr.3d 213, 225 n. 14 (Cal. 2008) (holding that "some evidence" standard was met where Petitioner failed to gain insight into his previous violent behavior and to take responsibility for the commitment offense).

An indeterminate life sentence prisoners are entitled to an initial parole consideration hearing and progress hearings subsequent to the initial hearing. *See* Cal. Code Regs., tit. 15, §§ 2304 and 2305.  The Board is to first determine if the prisoner is suitable for parole prior to determining the total period of confinement.  Cal. Code Regs., tit. 15, § 2315.  Factors affecting the severity of the offense and the risk of danger to society are to be considered in determining whether an ISL prisoner is unsuitable for parole  Cal. Code Regs., tit. 15, § 2316.  Examples of factors indicating that the prisoner is unsuitable for parole are: a history of violent attacks or of forcible sexual assaults on others, a persistent pattern of criminal behavior and failure to demonstrate evidence of a substantial change for the better, and the presence of a psychiatric or psychological condition relating to prisoner's criminality that creates a high likelihood of Petitioner committing a new serious crime if released.  Cal. Code Regs., tit. 15, § 2316(a)-(d).

**III.    Review of Petitioner's Claims**

**A.    Ground One and Eleven**

1    Petitioner claims, as his first ground for relief, that the Board's decision violated his right to

2    due process of the law as the decision was not reached by a preponderance of the relevant and

3    material evidence. (Pet. at 5). As his last claim for relief, Petitioner contends that the Board's

4    reliance on static factors, such as the commitment offense, violated Petitioner's right to due process

5    of the law. As the Board's reliance on immutable factors implicates the question of whether "some

6    evidence" supports the Board's conclusion and therefore whether Petitioner's right to due process of

7    the law were violated, this Court analyzes both claims under this section. Petitioner raised these

8    claims before the California Superior Court, the last court to issue a reasoned decision in this case.

9    The Superior court summarily denied Petitioner's claims. As a result of the unexplained rejection,

10   this Court conducts an independent review of the record to decide whether the state court's decision

11   was objectively reasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

12   Petitioner and Respondent both argue that the "some evidence" standard does not apply to

13   parole determination hearings. Petitioner argues for a higher standard, specifically alleging the

14   Board was required to find by a preponderance of the material and relevant evidence that Petitioner

15   was unsuitable for parole. Meanwhile, Respondent contends that clearly establish Federal law does

16   not require that this Court apply the "some evidence" standard. Respondent further contends that

17   due process merely entitles Petitioner the right to be heard and for the Board to state their reasons.

18   Despite Respondent's contentions, the Ninth Circuit has consistently rejected such an argument in

19   finding that due process additionally requires that the Board's decision be supported by "some

20   evidence." *See* Irons, 505 F.3d at 851; *see also* Sass, 461 F.3d at 1128-1129. Conversely,

21   Petitioner's contention, that the Board was required to find by a preponderance of the evidence that

22   Petitioner was unsuitable for parole, is unsupported by citation to any relevant legal authority,

23   precedent, or statute. Petitioner does not claim nor would the record support an allegation that

24   Petitioner was deprived of his other rights under the Due Process Clause, such as the right to be

25   heard at the hearing. Thus, the dispositive inquiry before this Court regarding Petitioner's right to

26   due process of the law is whether there was some evidence to support the Board's determination that

27   Petitioner posed a current unreasonable risk to the public safety.

28   The discussion of whether "some evidence" exists to support the Board's conclusion, that

Petitioner posed a current unreasonable risk of danger to the public safety, is framed by the state's statutes and regulations governing parole suitability determinations.  Irons, 505 F.3d at 851; Briggs, 334 F.3d at 915.  California's regulations permit the consideration of unchanging factors, such as the commitment offense, a prisoner's previous record of violence, and a prisoner's unstable social history.  See Cal. Code Regs., tit. 15, §§ 2402(c)(1)-(3).

While California regulations permit consideration of factors relating to the commitment offense, the California Supreme Court recently stated:

> Accordingly, we conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

In re Lawrence, 44 Cal.4th 1181,1214 (Cal. 2008)

The Lawrence court further clarified that, "the Board or Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such a reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety."  Id. at 1221 (holding that the relevant inquiry for a reviewing court is whether some evidence supports the decision that the inmate constitutes a current danger to the public safety, not merely whether some evidence confirms the existence of the Board's factual findings).

Additionally, the Ninth Circuit has expressed reservations about denying parole based solely on immutable factors but permitted such reliance in limited circumstances.  Briggs v. Terhune, 334 F.3d 910, 916-917 (9th Cir. 2003)(stating that, "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct of prior imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.");  Sass, 461 F.3d at 1139-1140 (Reinhardt, J., dissenting); Irons, 505 F.3d at 853-854 (holding, in discussing Sass and Briggs, that "[a]ll we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when

1   these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.").

2          After reviewing the record, this Court concludes that the Board's decision was supported by

3   "some evidence" and that Petitioner's right to due process of the law was not violated as he received

4   all the process due to him under the governing law.  *See* <u>Sass</u>, 461 F.3d at 1129.  The Board's

5   conclusion, that Petitioner posed an unreasonable risk of danger to the public safety and was

6   therefore unsuitable for parole, was based on six factors: 1) the commitment offense was carried out

7   in an especially cruel and callous manner; 2) Petitioner pre-commitment history displayed an

8   escalating pattern of criminal conduct; 3) Petitioner's unstable social history, including Petitioner's

9   drug use and limited education/employment history; 4) the need for a more updated and thorough

10  psychiatric report; 5) Petitioner's lack of suitable parole plans; and 6) the opposition by the District

11  Attorney's office.  (Answer Ex. B at 45-47).  The Board also noted favorable factors for the grant of

12  parole–namely, Petitioner's disciplinary free behavior since 1994, "outstanding" work reports,

13  acquisition of two vocational skills, and ongoing participation in self-help programs.  (Id at 24-29).

14  However, the Board concluded that, "[Petitioner's] positive achievements does not outweigh the

15  unsuitability at this time so [Petitioner's] parole is going to be denied for one year.  What we're

16  recommending to [Petitioner], we're recommending right off the bat that [Petitioner] establish some

17  strong parole plans."  (Id. at 48-49).  The Board further recommended that the parole plans include

18  viable work and residency plans, in addition to participation in substance abuse programs.  (Id. at

19  49).

20          As stated by the Board, Petitioner's failure to have viable parole plans was a glaring

21  omission, that they were particularly concerned with in determining that Petitioner was currently

22  unsuitable for parole.  The Board found that, "[p]arole plans, the prisoner failed in that area.  He does

23  not have viable residential plans.  He does not have acceptable employment plans."  (Id. at 46).  The

24  Board further stated that, "the prisoner needs to make an effort to establish firm parole plans.  He

25  needs to continue to participate in self-help programming, the kind that will enable him to face,

26  discuss, understand, and cope with stressful situation in a non-destructive manner.  Until enough

27  progress is made the prisoner continues to be unpredictable and a threat to others."  (Id. at 47).  The

28  Board found that the lack of viable parole plans when considered in light of certain immutable

factors, such as Petitioner's unstable social history and the circumstances of the commitment offense, made Petitioner unsuitable for parole. Specifically the Board stated, "[w]e'd certainly like to see when you establish your parole plans that you make substance abuse a part of your parole plans," and admonished Petitioner that, "[b]ut you have to take in the fact that you were a thief before you came in. You were a drug user before you came in. And you didn't have a work history, and substance abuse was a big part of it. So you need to make sure you have all of those things in place before you get a parole date." (Id. at 48).

During the parole board hearing, Petitioner confirmed that he had engaged in very little meaningful employment prior to his incarceration, working briefly as a dishwasher prior to coming to prison. (Answer Ex. B at 20-21). The Board commended Petitioner for acquiring at least two vocational skills during his imprisonment that could be used upon his release. (Id. at 24-26, 46). More importantly, though, Petitioner admitted that he had no viable employment plans. (Id. at 30-31). Additionally, the Board was confronted with a lack of evidence establishing Petitioner's residency plan after parole. While Petitioner planned to live with his mother, there was no letter in Petitioner's file from his mother confirming this residency plan. (Id. at 30). Further, the letter from the Salvation Army in Merced, considered by the Board at the hearing, stated they could not house Petitioner in that particular city. (Id. at 31-32).

The discourse between Petitioner and the Board further reveals that the motive for the crime was inexplicable as Petitioner admitted that the shooting resulted from a robbery in which Petitioner obtained one hundred dollars. (Id. at 14 ). The District Attorney's Office presented evidence at the hearing that the crime was committed in a cold hearted manner, reading into the record the finding by the California Court of Appeals that, "as [Petitioner] was leaving the store he suddenly turned back and fired once, mortally wounding the shopkeeper." (Id. at 35-36).

The Board also expressed the need for a more recent and thorough psychological evaluation, noting that the previous report lacked specifics regarding Petitioner's violence potential in the community , the significance of alcohol and drug abuse in relation to Petitioner's commitment offense, Petitioner's ability to refrain from using those substances, and whether Petitioner had come to terms with and explored the underlying causes of the commitment offense. (Answer Ex. B at 46,

49-50).  The psychological evaluation by Dr. Ronald Sheldon is dated as of June 20, 2001, almost

three years prior to the March 24, 2004 parole hearing Petitioner is currently challenging.  (Answer

Ex. F at 22-27).  In that report, Dr. Sheldon's assessment of dangerousness was brief, consisting of

three sentences in which Dr. Sheldon stated that "[w]ithin a controlled setting, based on the inmate's

incarceration record and present personality, there is little manifested danger to self and others.

Violence potential before incarceration was average and at present has decreased.  Inmate had made

considerable gains in terms of focusing on self-improvement through self-help, education, work, and

programming here at this institution and previous institutions."

Consequently, the evidence taken as a whole is sufficient to show that it would not be

unreasonable for a court to conclude that there was "some evidence" supporting the Board's

determination that Petitioner posed an unreasonable risk of danger to society if released from prison.

*See* Cal. Code Regs., tit. 15, § 2402(b) ("Circumstances which taken alone may not firmly establish

unsuitability for parole may contribute to a pattern which results in a finding of unsuitability").  The

Court concludes that Petitioner's case would not warrant the caution expressed by the Ninth Circuit

regarding the use of immutable factors to constitute the "some evidence" required to support the

denial of parole.  The Board's conclusion, that Petitioner currently posed an unreasonable risk of

danger to the public safety rested, on several factors and the Board's reliance on immutable factors

was probative of Petitioner's current unsuitability for parole.  Petitioner's unstable social history,

specifically his substance abuse and lack of employment history, was connected to the circumstances

of the commitment offense as the robbery resulted from a need to repay a drug debt.   It is not

surprising then that the Board found Petitioner unsuitable where he had  no viable parole plans with

regards to residency, self-help or therapy for the substance abuse, and employment, cautioning

Petitioner, " to take in the fact that you were a thief before you came in.  You were a drug user before

you came in.  And you didn't have a work history, and substance abuse was a big part of it."

(Answer Ex. B at 48).   The Board's  denial of parole also rested on the absence of a psychiatric

evaluation examining "[t]he other important factor we think is the significance of alcohol and drugs

as it related to the commitment offense and your ability to refrain from them." (Id.)   As the record

reveals "some evidence" supports the Board's finding that Petitioner was unsuitable for parole,

1    Petitioner's claim that his right to due process of the law must be rejected.

2    **B.     Ground Two, Seven, and Ten**

3        Petitioner asserts, as his second ground for relief, that the Board was required and failed to

4    consider psychiatric reports and the total period of confinement.  (Pet. at 5) (citing to Cal. Code

5    Regs., tit. 15, §§ 2315 and 2317).  As his seventh ground for relief, Petitioner asserts that the Board's

6    failure to consider the time he had served violated his liberty interest.  Petitioner argues, in his tenth

7    ground for relief, that the Board misconstrued the psychiatric evaluation done by Dr. Sheldon.  As all

8    three claims raise the same issues, this Court analyzes them together.  Petitioner raised these claims

9    before the California Superior Court, the last court to issue a reasoned decision in this case.  The

10   Superior court summarily denied Petitioner's claims.   As a result of the unexplained rejection, this

11   Court conducts an independent review of the record to decide whether the state court's decision was

12   objectively reasonable.  Himes, 336 F.3d at 853.

13       Firstly, the Court notes that Petitioner cites no relevant legal authority for the proposition that

14   the Board is required to consider the total period of confinement in determining whether Petitioner is

15   suitable for parole.  Section 2317 establishes the relevant factors for setting a parole date *after* the

16   prisoner has been found suitable for parole.  (Cal. Code Regs., tit. 15, § 2317(a)).  Consequently, that

17   provision is inapplicable to Petitioner's case as Petitioner was found unsuitable for parole.  Section

18   2315, meanwhile, states, "[i]n considering an ISL prisoner for parole, the hearing panel shall consider

19   the criteria and be guided by the ranges suggest in this article in setting a parole date.  Applying the

20   criteria in 2316, the hearing panel shall *first determine whether prisoner is unsuitable for parole.  If*

21   *the prisoner is found unsuitable, parole shall be denied*."  (Cal. Code Regs., tit. 15, § 2315)

22   (emphasis added).  Section 2316 permits the parole board to consider "factors which affect the

23   severity of the offense and the risk of danger to society if the prisoner were released."  (Cal. Code

24   Regs., tit. 15, § 2316).

25       Petitioner additionally cites to Section 2282 for support in his argument that the Board

26   violated his constitutional rights in failing to consider the amount of time Petitioner has already

27   served.  However, the section Petitioner cites to regards the setting of a base term for life prisoners

28   who have already been found suitable for parole.  *See* Cal. Code Regs., tit. 15, 2282 (a).

1   Consequently, none of the regulations Petitioner cites to stands for the proposition that the Board

2   must consider the total period of confinement in determining parole suitability.  Rather, Title 15 of

3   the California Code of regulations section 2281, setting forth the criteria to consider for parole

4   determinations of life prisoners, states, "*Regardless* of the length of time served, a life prisoner shall

5   be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an

6   unreasonable risk of danger to society if released from prison."  Cal. Code. Regs., tit. 15, § 2281(a)

7   (emphasis added).  Consequently, the Court rejects the claim that Petitioner's rights were violated by

8   the Board's failure to consider Petitioner's period of confinement.

9        California regulation do mandate the consideration of a prisoner's past and present mental

10  state.  Cal. Code Regs., tit. 15, § 2281(b).  However, contrary to Petitioner's assertion that the Board

11  failed to consider psychiatric reports, the record of the hearing illustrates that the Board considered

12  the report submitted by Dr. Sheldon.  (Answer Ex. B at 27-29).  The Board noted that Dr. Sheldon

13  report's contained the finding that Petitioner's violence potential had decreased.  However, the Board

14  ultimately concluded that Petitioner was unsuitable for release because Petitioner's "positive

15  achievements does not outweigh the factors of unsuitability at this time so [Petitioner's] parole is

16  going to be denied for one year."  (Answer Ex. B at 49).  The Board further noted that an updated

17  and more detailed psychiatric evaluation was required.  (Answer Ex. B at 46).  As the Board did

18  consider the psychiatric evaluation by Dr. Sheldon, Petitioner's claim otherwise is erroneous.

19       As his tenth ground for relief, Petitioner claims that his right to due process of the law was

20  violated when the Board used the psychiatric report to deny him parole.  Petitioner specifically

21  alleges that the Panel misconstrued the report as not supportive of release.  Petitioner's claim then is

22  that the Board incorrectly weighed such evidence in reaching their decision.  "The requirements of

23  due process are satisfied if some evidence supports the decision...Ascertaining whether this standard

24  is satisfied does not require an examination of the entire record, independent assessment of the

25  credibility of witnesses, or *weighing of the evidence*."  Hill, 472 U.S. at 455 (emphasis added).

26  Additionally, Petitioner appears to argue that the Board should have given more weight to arguably

27  positive factors, such at the psychiatric evaluation.  This Court cannot re-weigh the factors

28  supporting parole suitability and the factors supporting parole unsuitability.  *See* Powell v. Gomez,

1   33 F.3d 39, 42 (9th Cir. 1994); <u>De Boes v. Sisto</u>, No. 07-5373C, 2007 WL 4940287 at *8 (C.D. Cal.

2   2007).  As "some evidence" supports the Board's finding that Petitioner posed an unreasonable risk

3   of danger to the public safety.   Consequently, Petitioner's right to due process of the law was not

4   violated when the Board denied Petitioner parole.

5       **C.    Ground Three**

6       Petitioner's third ground for relief alleges a violation of his liberty interest and the Ex Post

7   Facto Clause, pursuant to <u>Stanworth</u>.  Petitioner further alleges that, as an indeterminate sentence law

8   ("ISL") prisoner, his punishment has been excessive and violates the pre-Briggs Initiative standard.

9   Petitioner raised these claims before the California Superior Court, the last court to issue a reasoned

10  decision in this case.  The Superior court summarily denied Petitioner's claims.   As a result of the

11  unexplained rejection, this Court conducts an independent review of the record to decide whether the

12  state court's decision was objectively reasonable.  <u>Himes</u>, 336 F.3d at 853.

13      *1.    Ex Post Facto*

14      The Ex Post Facto Clause of the United States Constitution prevents the government from

15  retroactively altering the definition of or increasing the punishment for a crime.  <u>California Dept. of</u>

16  <u>Corrections v. Morales</u>, 514 U.S. 499, 504-05 (1995) (citing <u>Collins v. Youngblood</u>, 497 U.S. 37, 41

17  (1990)); U.S. Con. art. I, § 10, cl. 1.  "To fall within the ex post facto prohibition, a law must be

18  retrospective-that is, 'it must apply to events occurring before its enactment'-and it 'must

19  disadvantage the offender affected by it,' ... by altering the definition of criminal conduct or

20  increasing the punishment for the crime."  <u>Johnson v. Runnels</u>, 2007 WL 312944 at *8 (E.D. Cal.

21  2007)(citing <u>Lynce v. Mathis</u>, 519 U.S. 433, 441 (1997)).

22      The California Supreme Court in <u>Stanworth</u> found that the application of the parole release

23  consideration standards under the Determinate Sentencing Law ("DSL") to a defendant serving a life

24  imprisonment under the ISL constituted an *ex post facto* violation.  <u>In re Stanworth</u>, 33 Cal.3d 176,

25  183 (Cal. 1982).  The <u>Stanworth</u> court held that the changes between the DSL and ISL regarding the

26  setting of parole release dates were more than procedural and could detrimentally affect prisoners.

27  <u>Id</u>. at 188.  Thus, the court concluded that prisoners were entitled to receive consideration and the

28  benefits, if any, of setting parole release dates under both laws.  <u>Id</u>

1    However, Petitioner's case differs significantly  from Stanworth as Stanworth concerned the

2   setting of parole release dates after the inmate had already been found suitable for parole.  *See* id. at

3   178-179.  Stanworth, therefore, did not address whether a violation of the Ex Post Facto Clause

4   occurs where the Board uses the parole suitability standards of the DSL to inmates sentenced under

5   the ISL.  However, the Ninth Circuit found in Connor v. Estelle, 981 F.2d 1032 (9th Cir. 1992)(per

6   curiam), that the *ex post facto* prohibition was not violated where a prisoner serving an ISL sentence

7   was denied parole using DSL guidelines.  Id. at 1033-34.  The Connor court found that since both the

8   DSL and ISL requires the consideration of the same criteria, "the application of the DSL parole-

9   suitability guidelines to prisoners sentenced under the ISL does not disadvantage them, and therefore

10  does not violate the federal constitutional prohibition against ex post facto laws."  Id. at 1034 (citing

11  to In re Duarte, 143 Cal.App.3d 943, 947-949 (Cal. Ct. App. 1983) and In re Seabock, 140

12  Cal.App.3d 29, 40 (Cal. Ct. App. 1983)).  Consequently, Petitioner claim that the Board violated his

13  constitutional rights pursuant to Stanworth and the Ex Post Facto Clause, must be rejected as without

14  merit.

15       *2.    Excessive Punishment*

16       A criminal sentence that is not proportionate to the crime for which a defendant is convicted

17  may indeed violate the Eighth Amendment.  Rummel v. Estelle, 445 U.S. 263, 265-266 (1980)

18  (upholding a life sentence with the possibility of parole,  imposed under a Texas recidivist statute,

19  for a defendant convicted of obtaining $120.75 by false pretenses, an offense normally punishable by

20  imprisonment for two to ten years); *cf.* Solem v. Helm, 463 U.S. 277, 279-81 (1983) (applying the

21  proportionality criteria to find that sentence of life without the possibility of parole was grossly

22  disproportionate to crime of uttering a "no account" check for $100.00, even in light of defendant's

23  prior six nonviolent felony convictions).

24       In Harmelin v. Michigan, 501 U.S. 957 (1991), the defendant received a mandatory sentence

25  of life in prison *without* the possibility of parole for possession of more than 650 grams of cocaine,

26  his first felony offense.  Harmelin v. Michigan, 501 U.S. 957 (1991).  The U.S. Supreme Court

27  upheld the sentence, with five justices agreeing, for varying reasons, that the sentence did not violate

28  the Eighth Amendment.  Although the Court did not produce a majority opinion, seven justices

favored some manner of proportionality review. Justice Kennedy, in a concurring opinion joined by Justices O'Connor and Souter, stated that a noncapital sentence could violate the Eighth Amendment if it was "grossly disproportionate" to the crime.

The majority of the justices in Harmelin, though, agreed that outside capital punishment, deeming a sentence cruel and unusual punishment is "exceedingly rare" due to the lack of objective guidelines for terms of imprisonment. Id. at 964. The threshold for such an inference of disproportionality is high. See id. at 1001. In concluding that the defendant's sentence did not meet the threshold factor of "gross disproportionality," Justice Kennedy stressed the serious nature of Harmelin's offense, stating that the offense "threatened to cause grave harm to society" unlike "the relatively minor, nonviolent crime at issue in Solem." Id. at 1002.

In Lockyer v. Andrade, 123 S. Ct.1166 (2003), the Supreme Court held that the only clearly established legal principle is that a "gross disproportionality" review applies to criminal sentences for a term of years. Id. at 1173. Citing extensively to its previous cases, the Court acknowledged that it has "not established a clear and consistent path for courts to follow." Id. Thus, the Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' frame work is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." Id. The Supreme Court further stated that, "[t]he Eight Amendment does not require strict proportionality between the crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." Ewing v. California, 123 S.Ct. 1179, 1186-1187 (2003)(adopting Justice Kennedy's view expressed in his concurring opinion in Harmelin, 501 U.S. at 1001 (citing Solem, 463 U.S. at 288)).

Petitioner's sentence is not inconsistent with the holdings of the U.S. Supreme Court discussed above. Petitioner has failed to show that a primary term of life imprisonment is constitutionally disproportionate to his individual culpability.[2] See Andrade, 538 U.S. at 77; see also Greenholtz, 442 U.S. at 7 ( "[t]here is no constitutional or inherent right of a convicted person to be

_____

[2]As noted below, under Petitioners' Ground Nine, where the Board does not set a fixed release date for a prisoner, the courts will deem the prisoner's primary term to be the maximum. In this instant case, that term would be life. See In re Morrall, 102 Cal.App.4th 280 (Cal. Ct. App. 2002).

1  conditionally released before the expiration of a valid sentence").  Accordingly, Petitioner is not

2  entitled to relief on this claim.

3       *3.     Pre-Briggs Initiative Standard*

4       The Briggs Initiative was a proposition passed into law during the November 1978 general

5  election.  In re Olson, 149 Cal.App.4th 790, 796 n.5 (Cal. Ct. App. 2007).  The Briggs Initiative

6  rewrote California Penal Code section 190, increasing the minimum punishment for prisoners

7  convicted of murder from an indeterminate life sentence to twenty-five years-to-life.  People v.

8  Cooper, 27 Cal.4th 38, 41-43 (Cal. 2002); Jones v. Carey, No. 05-1486C 2006 WL 355179 at *3

9  (E.D. Cal. 2006). The Briggs Initiative also made convicted murderers ineligible for pre-sentence

10 good conduct credits.  People v. Hutchins, 90 Cal.App.4th 1308, 1316 (Cal. Ct. App. 2001)(holding

11 that limitations on pre-sentence conduct credits cannot be applied to offenses committed prior to the

12 effective date of the statute).

13      While Petitioner cites to no legal authority in this instant case, Petitioner's brief before the

14 state courts cited to Flemming v. Oregon Board of Parole, 998 F.2d 721 (9th Cir. 1993) for support.

15 (See Answer Ex. E at 8).  In Flemming, the Ninth Circuit found that the retroactive application of a

16 regulation to calculate the prisoner's release date violate the Ex Post Facto Clause.  Id. at 721.

17 However, unlike in Flemming, Petitioner has not established that his  release date was affected by the

18 Briggs Initiative.  Petitioner merely alleges that since he is an ISL prisoner and was convicted on

19 April 29, 1976, the denial of parole in 2004 was a violation of the pre-Briggs Initiative standard.  The

20 record of Petitioner's parole hearing does not reveal that the California Penal Code, as amended by

21 the Briggs Initiative, played any role in the Board's determination that Petitioner was unsuitable for

22 parole.[3]  Such a conclusory and unsupported claim cannot be a basis upon which this Court may

23 grant habeas relief.  See Quinteros v. Hernandez, 419 F.Supp.2d 1209, 1217-18 (C.D. Cal. 2006)

24 (stating that conclusory claims that are not supported by a statement of specific facts do not warrant

25 habeas relief); Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (finding that conclusory

26 allegations are not sufficient to support habeas relief).

27

28      [3]As noted in this Court's discussion of Petitioner's Ground nine, Petitioner is not entitled to the setting of a parole release date until he has been found suitable for parole.

1

**D.     Ground Four**

2     Petitioner contends, as his fourth ground for relief, that the Board's denial of parole was

3     based on legally vague language regarding the gravity of the offense.  Petitioner goes on to argue that

4     his commitment offense did not meet the "particular egregious standard for murder."  (Pet. at 6).

5     Petitioner raised this claim before the Superior Court of Merced County, the last court to issue a

6     reasoned decision.  The Superior Court issued a summary denial of this claim.  As a result of the

7     unexplained rejection, this Court conducts an independent review of the record to decide whether the

8     state court's decision was objectively reasonable.  <u>Himes</u>, 336 F.3d at 853.

9     Firstly, the Court notes that Petitioner failed to identify the specific regulation or statute that

10    Petitioner challenges as legally vague in violation of his constitutional rights.  The record of the

11    hearing reveals that the panel used language similar to Title 15 of the California Code of Regulations

12    § 2402(c)(1) in discussing Petitioner's commitment offense.  Section 2402(c)(1) permits

13    consideration of the commitment offense as a factor showing unsuitability for parole if "the prisoner

14    committed the offense in an especially heinous, atrocious or cruel manner."  <u>Id</u>.  The regulation goes

15    on to list five factors to consider in determining whether the offense was committed in a "heinous,

16    atrocious or cruel manner."  <u>Id</u>.  Those five factors include whether multiple victims were attacked,

17    injured or killed in the same or separate incidents; the offense was carried out in a dispassionate and

18    calculated manner; the victim was abused, defiled or mutilated during or after the offense; the

19    offense was carried out in a manner which demonstrates an exceptionally callous disregard for

20    human suffering; the motive for the crime is inexplicable or very trivial in relation to the offense.  <u>Id</u>.

21    at (A)-(E).

22    "The Due Process Clause does not require the same precision in the drafting of parole release

23    statutes as is required in the drafting of penal laws."  <u>Hess v. Board of Parole and Post-Prison</u>

24    <u>Supervision</u>, 514 F.3d 909, 913-14 (9th Cir. 2008).   Thus, as the term "especially heinous, atrocious,

25    or cruel" is limited and defined by the five factors set forth in subsection (A)-(E), Section 2404 is not

26    constitutionally vague and Petitioner's facial challenge to this regulation as unconstitutional must be

27    rejected.  <em>See</em> <u>Ortiz v. Ayers</u>, No. 06-5368C, 2008 WL 2051051 at *5 (N.D. Cal. 2008); <u>Neblett v.</u>

28    <u>Ornoski</u>, No. 05-4228C, 2008 WL 698477 at *9 (N.D. Cal. 2008); <u>Carl v. Knowles</u>, No. 04-1796C,

1   2008 WL 3916005 at * 8 (E.D. Cal. 2008); Stipner v. Ayers, No. 05-5400C, 2008 WL 9006161 at *5

2   (N.D. Cal. 2008).

3       Petitioner's additional allegation that his commitment offense did not meet the particular

4   egregious standards for murder is a challenge to the Board's characterization of the crime.  This

5   Court cannot re-weigh the factors supporting parole suitability and the factors supporting parole

6   unsuitability.  *See* Powell, 33 F.3d at 42.  Additionally, apart from the commitment offense, there is

7   some evidence supporting the Board's decision and thus the denial of parole did not violate

8   Petitioner's right to due process of the law.  *See* Sass, 461 F.3d at 1128-1129 (holding that

9   petitioner's prior offenses and the gravity of his commitment offenses constituted some evidence to

10  support the Board's decision on parole unsuitability).

11      **E.      Ground Five**

12       Petitioner also alleges that his right to due process of the law was violated by the Board's

13  reliance on the opposition to parole by the District Attorney's Office.  Petitioner specifically claims

14  that the opposition was an insufficient basis for the Board's denial of parole as the District

15  Attorney's Office failed to meet its burden of proof in asserting that Petitioner remained a threat to

16  the public safety.  Petitioner raised this claim before the California Superior Court, the last court to

17  issue a reasoned decision in this case.  The Superior court summarily denied Petitioner's claims.   As

18  a result of the unexplained rejection, this Court conducts an independent review of the record to

19  decide whether the state court's decision was objectively reasonable.  Himes, 336 F.3d at 853.

20      Petitioner's claim relies on the premise that the District Attorney bears the burden of proving

21  that Petitioner was a danger to the public safety by a preponderance of the evidence.  However,

22  Petitioner cites to no statute, precedent, or other legal authority for the proposition that the District

23  Attorney's Office bears any burden of proof with regards to a parole determination hearing.  As such,

24  Petitioner's claim amounts to nothing more than a bare allegation that the District Attorney's

25  opposition violated Petitioner's right to due process of the law.  Such a conclusory and unsupported

26  claim cannot be a basis upon which this Court may grant habeas relief.  *See* Quinteros, 419

27  F.Supp.2d at 1217-18; Jones v. Gomez, 66 F.3d at 204-05.

28      Furthermore, the opposition by the District Attorney's Office was one of several factors

relied upon by the Board in their determination that Petitioner was unsuitable for parole.  As noted

above, there was "some evidence" to support the Board's decision.  Consequently, Petitioner's right

to due process of the law was not violated by the Board's reliance on the District Attorney's

opposition.

### F.    Ground Six

Petitioner's sixth ground for relief is that there was no evidence to justify the Board's finding

that Petitioner required more therapy.  Petitioner raised this claim before the Superior Court of

Merced County, the last court to issue a reasoned decision.  The Superior Court issued a summary

denial of this claim.  As a result of the unexplained rejection, this Court conducts an independent

review of the record to decide whether the state court's decision was objectively reasonable.  Himes,

336 F.3d at 853.

The Court notes that the evidence before the Board indicated Petitioner had a history of

substance abuse issues, including the psychiatric report which stated that, "[Petitioner] has had a

serious Heroin dependency problems in the past. [Petitioner] had a significant substance abuse

problem, with Heroin being his drug of choice."  (Answer Ex. F at 23).   Dr. Sheldon's report further

stated that, "[Petitioner] should continue in his present course, continue to be disciplinary free, and,

if possible continue his work.  He should participate in self-help activities that are available within

the prisoner setting.  If limited, [Petitioner] is encouraged to read self-help books. [Petitioner] should

continue in NA/AA, which appears to have been an important support for him." (Id. at 27).

Petitioner's participation in self-help programs led the Board to commended Petitioner for his

progress, and thus resulted in the Board's findings that Petitioner needed to continue to participate in

these programs to "enable him to face, discuss, understand, and cope with stressful situations in a

non-destructive manner" and that these programs needed to be a part of Petitioner's parole plans.

(Answer Ex. B at 47-48).

While the sole inquiry before this Court is whether "some evidence" supported the Board's

ultimate determination that Petitioner posed an unreasonable risk of danger to the public safety, this

Court notes that there was evidence to support the Board's conclusion that Petitioner should continue

to participate in self-help programs.  Moreover, even if the Board made some insupportable findings,

1   the Court nevertheless must deny habeas relief where, as here, there exists "some evidence"

2   supporting the Board's findings of unsuitability.  *See* Biggs, 334 F.3d at 916.

3   **G.    Ground Eight**

4   Petitioner's eighth ground for relief is that the Board acted pursuant to a no parole policy

5   when the panel found Petitioner unsuitable for parole and thus violated his constitutional rights.

6   Petitioner raised this claim before the Superior Court of Merced County, the last court to issue a

7   reasoned decision.  The Superior Court issued a summary denial of this claim.  As a result of the

8   unexplained rejection, this Court conducts an independent review of the record to decide whether the

9   state court's decision was objectively reasonable.  Himes, 336 F.3d at 853.

10   The record of the hearing indicates that, contrary to being guided by a "no-parole" policy, the

11   Board, according to its statutorily assigned duty, examined a variety of prescribed factors and applied

12   these factors in its individualized assessment of whether Petitioner was suitable for parole.  *See* Cal.

13   Code Regs., tit. 15, §§ 2281, 2404.  As the Board made an individualized assessment based upon the

14   particular facts of Petitioner's case, the argument that the Board applied a "no-parole" policy to

15   Petitioner's case is simply not tenable.  Furthermore, Petitioner has not produced any evidence to

16   support his contention that the Board acted pursuant to such a policy.  Thus, Petitioner's eighth

17   ground for relief is nothing more than a conclusory allegation, which cannot provide a basis for

18   habeas relief.  *See* Jones, 66 F.3d at 204-05.

19   **H.    Ground Nine**

20   Petitioner contends, as his ninth ground for relief, that the Board's failure to set a primary

21   term of imprisonment violated his right to due process of the law.  Petitioner raised this claim before

22   the Superior Court of Merced County, the last court to issue a reasoned decision.  The Superior Court

23   issued a summary denial of this claim.  As a result of the unexplained rejection, this Court conducts

24   an independent review of the record to decide whether the state court's decision was objectively

25   reasonable.  Himes, 336 F.3d at 853.

26   California law provides that where the Board fails to promptly fix a primary term, "the court

27   will deem it to have been fixed at the maximum" by default.  In re Rodriguez, 14 Cal.3d 639, 654

28   (Cal. 1975); *see also* In re Bobby Williams, 53 Cal.App.3d 10, 17 (Cal. Ct. App. 1975)(quoting

1  People v. Wingo, 14 Cal.3d 169, 182 (Cal. 1975) for the proposition that where the Board omits or

2  declines to fix the term of a prisoner serving an indeterminate sentence, the maximum term will be

3  deemed to the fixed term).  Furthermore, California law entitles Petitioner to a base term only *after*

4  Petitioner is found suitable for parole.  In re Stanworth, 33 Cal.3d 176, 183 (Cal. 1982)(holding that

5  under both the indeterminate and determinate sentencing law, a life prisoner must first be found

6  suitable for parole prior to setting a parole date).  Since Petitioner was deemed unsuitable for parole,

7  the Board did not violate Petitioner's right to due process of the law by not setting a base term or

8  parole date.  *See*  Cal. Code Regs., tit. 15, §§ 2401, 2402(c); *see also* Connor, 981 F.2d at 1033.

9  **RECOMMENDATION**

10         Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

11  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

12  Respondent.

13         This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

14  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

15  of the Local Rules of Practice for the United States District Court, Eastern District of California.

16  Within thirty (30) days after being served with a copy, any party may file written objections with the

17  court and serve a copy on all parties.  Such a document should be captioned "Objections to

18  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

19  filed within ten (10) court days (plus three days if served by mail) after service of the objections.

20  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The

21  parties are advised that failure to file objections within the specified time may waive the right to

22  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23

24  IT IS SO ORDERED.

25  Dated:    October 6, 2008              /s/ John M. Dixon
                                    UNITED STATES MAGISTRATE JUDGE

26

27

28